944 F.2d 903
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John P. McCOY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Doyle David MOORE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John P. McCOY, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Doyle David MOORE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John P. McCOY, Defendant-Appellant.
 Nos. 89-5658, 89-5660, 90-7351, 90-7352 and 90-7356.
 United States Court of Appeals, Fourth Circuit.
 Sept. 13, 1991.
 
 1
 Appeals from the United States District Court for the Southern District of West Virginia, at Huntington. Charles H. Haden, II, Chief District Judge; Robert J. Staker, District Judge. (CR-88-272)
 
 
 2
 Argued: Michael Joseph Curtis, Ashland, Ky., for appellant Moore; John Bertram Mann, Levit & Mann, Richmond, Va., for appellant McCoy; Sanford Benjamin Bryant, Assistant United States Attorney, Huntington, W.Va., for appellee.
 
 
 3
 On Brief: Michael W. Carey, United States Attorney, Huntington, W.Va., for appellee.
 
 
 4
 S.D.W.Va.
 
 
 5
 AFFIRMED.
 
 
 6
 Before K.K. HALL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and CLAUDE M. HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 OPINION
 CLAUDE M. HILTON, District Judge:
 
 7
 Defendant John P. McCoy raises on appeal a number of issues arising from his conviction by a jury in a bank robbery, murder, and witness intimidation trial and conviction by a jury in a separate counterfeiting trial. Defendant Doyle David Moore appeals his conviction by a jury in a bank robbery, murder, and witness intimidation trial. Finding no error below, we affirm the convictions.
 
 I.
 
 8
 A prolonged federal/state investigation into a bank robbery, murder and counterfeiting enterprise culminated in the return of a thirteencount indictment against defendants McCoy and Moore. Counts One and Two of the indictment charged McCoy, Moore and Harold Runyon with conspiracy and armed bank robbery in violation of 18 U.S.C. § 371 and 18 U.S.C. § 2113(a)(d) & § 2. Counts Three through Five charged McCoy, Rick Birchfield, and Debbie Farley with conspiracy, production of counterfeit U.S. currency and possession and concealment of United States currency in violation of 18 U.S.C. § 371, 18 U.S.C. § 471 & § 2, 18 U.S.C. § 472 & § 2. Count Six charged McCoy, Moore, and Runyon with conspiracy to threaten witnesses and kill a witness in violation of 18 U.S.C. § 371. Counts Seven through Twelve charged McCoy and Moore together and individually with various instances of threatening a witness in violation of 18 U.S.C. § 1512(b)(3). Count Thirteen charged McCoy and Runyon with killing a potential federal witness in violation of 18 U.S.C. § 1512(a)(1)(C).
 
 
 9
 Following the return of the indictment, the bank robbery/murder/witness intimidation case was severed from the counterfeiting case. Runyon pleaded guilty to Counts One and Thirteen in the bank robbery case and testified for the government at trial. McCoy and Moore were tried before a jury, Chief Judge Haden presiding, in the bank robbery/murder/witness intimidation trial on May 23, 1989 through June 2, 1989. McCoy was found guilty on Counts One, Two, Six, Seven, Eight, Ten, Eleven, and Thirteen. Moore was found guilty on Counts One, Two, and Eleven. The jury acquitted Moore on Counts Six and Twelve. On July 10, 1990, an evidentiary hearing was conducted on defendants' motion for a new bank robbery trial based on newly discovered evidence. Carl "Cateyes" Lockhart testified at the hearing that he and others had robbed the Matewan Bank. Judge Haden did not find the testimony credible and denied the motions for a new trial.
 
 
 10
 The counterfeiting case was tried before a jury, Judge Robert Staker presiding, on July 18, 1989 through July 24, 1989. Judge Staker directed a judgment of acquittal on Count Four, finding that the evidence demonstrated that the production of counterfeit currency occurred in Kentucky, and not the Southern District of West Virginia. McCoy was found guilty on Counts Three and Five.
 
 
 11
 The evidence revealed that on Saturday, January 3, 1987 a branch bank of the Matewan National Bank at Kermit, West Virginia, was robbed by two masked men carrying pistols. Approximately $273,000 in cash was taken from the bank. The robbers absconded in a black Ford Bronco truck, heading south from Kermit in the direction of Williamson. Following the robbery, West Virginia State Police Sgt. Roby Pope found the black Ford Bronco abandoned on Parsley Branch, a mining road located off U.S. Route 52, south of Kermit.
 
 
 12
 The robbery was planned in December of 1986. Defendant McCoy recruited defendant Moore, Harold Runyon, Russell Davis, David Maynard and Sammy Copley to participate in the robbery. Various plans were discussed by McCoy and Runyon to conduct the robbery. A videotape was prepared by Runyon and his ex-wife mapping out various routes to and from the bank. The robbers reviewed this tape frequently in the two weeks preceding the robbery. On Friday, January 2, 1987 defendants Moore and McCoy stole the black Ford Bronco from the Gulfmart in Kentucky. Defendant McCoy supplied Davis and defendant Moore with pistols and bullet-proof vests for use in the robbery.
 
 
 13
 On the morning of the robbery, defendant Moore and Davis, dressed in coveralls, work gloves, and ski masks, drove the stolen Bronco to the bank. Defendant McCoy and Runyon conducted surveillance from two other vehicles. All three vehicles were equipped with CB radios for communication purposes.
 
 
 14
 After robbing the bank, Davis and Moore returned to Parsley Branch, where McCoy and Runyon were waiting. Defendant Moore left with McCoy in McCoy's truck. Davis hid the money in a large tool box in Runyon's truck. The stolen Bronco was abandoned at Parsley Branch. The robbers took different routes back to Runyon's truck garage in Toler, Kentucky. The money was divided at Runyon's garage, with Davis' money to be parceled out in $5000 increments out of fear that he might brag.
 
 
 15
 The defendants had planned for Davis to remain at Runyon's garage for a period of time following the robbery. Runyon left his Ford 250 truck that was used in the robbery in the garage so the tires could be changed in the event tire tracks had been left at Parsley Branch. On Saturday or Sunday night, Runyon discovered that his Ford truck and Davis were gone. Runyon and defendant McCoy learned that Davis had taken the truck to a motel in Louisa, Kentucky. They traveled to Louisa, Kentucky to retrieve the truck.
 
 
 16
 A few days after the robbery, defendant Moore was arrested on other state charges. McCoy and Runyon learned that defendant Moore was a suspect in the Matewan bank robbery. With the arrest of Moore, McCoy and Runyon feared that Davis might reveal something about the bank robbery. They decided to get Davis out of the area. Runyon drove Davis to Louisville, Kentucky on January 6, 1987 from where he flew to Jacksonville, Florida. Runyon then went to California and Las Vegas to launder cash from the robbery.
 
 
 17
 Upon Runyon's return from California, defendant McCoy told him that Davis had called from Jacksonville to demand more money. Runyon drove to Florida to deliver more cash to Davis. When he arrived, he called Davis at his hotel in Jacksonville and was informed by Davis that he was, at that moment, being interviewed by a Secret Service agent with respect to a counterfeiting operation that he was involved in. Runyon decided not to talk to Davis at this time and returned to Kentucky. Defendant McCoy and Runyon later used false names to wire money to Davis in Florida.
 
 
 18
 In late January, Davis returned to Kentucky and demanded all of his money. McCoy told Runyon that he had heard that Davis had been talking a lot and bragging about robbing a bank. Runyon and McCoy decided to kill Davis. Runyon and his ex-wife dug a grave on top of Ford Mountain, near Meta, Kentucky. Defendants McCoy and Runyon told Davis to meet them the next evening and Davis would be given the rest of his share of the robbery proceeds. They met at Runyon's garage as planned and the three men drove to the top of Ford Mountain. Upon exiting the vehicle, Runyon shot Davis three times in the back. Davis fell to the ground. McCoy took Runyon's .22 caliber pistol and fired a shot into Davis' head. Defendant McCoy and Runyon placed Davis in the grave, removed his rings, wallet, and money, and covered the grave. The two then took Davis' car to Bluegrass Airport, Lexington, Kentucky, where they left it in long-term parking. On February 8, 1989, Davis' car was found by the FBI in long-term parking at Bluegrass Airport in Lexington, Kentucky. The FBI located the remains of Davis in the grave on top of Ford Mountain.
 
 
 19
 In the summer of 1988, McCoy initiated a counterfeiting operation. McCoy and an associate, Sammy Copley, visited Gordon Flesch Company, a business equipment distributor in Columbus, Ohio. McCoy obtained instruction and information about the Canon Laser Color Copier. In early summer, 1988, McCoy approached Kentucky businessman Rick Birchfield, with a proposal to produce counterfeit currency. McCoy asked Birchfield to acquire a Canon Laser Color Copier through his business, Southern Truck Parts. In return, McCoy proposed that he and Copley would use the machine to print counterfeit currency. Birchfield was to be paid $100,000 in real money in exchange for the machine.
 
 
 20
 In accordance with these plans, Birchfield purchased the copy machine on July 16, 1988 for $34,000. Copley and McCoy took the machine to Copley's Aflex, Kentucky residence. Copley staged a false burglary of Southern Truck Parts where the copier was kept to make it appear as if the Canon copies had been stolen. In the following days, McCoy and Copley printed $800,000 in counterfeit United States currency in Aflex, Kentucky.
 
 
 21
 Six individuals were recruited by Copley to distribute the counterfeit bills. All of the six distributees but one were residents of Williamson, West Virginia. McCoy met the six individuals in Ft. Gay, Wayne County, West Virginia. On July 21, 1988, McCoy and Copley sent the six recruits into Columbus to pass the counterfeit bills. Three of the team were arrested immediately. McCoy and Copley threw away and destroyed most of the remaining counterfeit currency. McCoy and Paul Shortridge later removed the Canon copier from Aflex, Kentucky and transported it to Debbie Farley's home in Ft. Gay, West Virginia.
 
 
 22
 While the machine was at Farley's home, McCoy determined to produce counterfeit Canadian money. Upon obtaining genuine Canadian currency from Canada, McCoy reproduced counterfeit Canadian currency. A second copier was obtained by Birchfield when the first machine stopped functioning. Both copiers were transported to Shortridge's residence at Trace Creek. Birchfield saw the copiers at Shortridge's home where McCoy was attempting to repair them. Federal agents seized the first Canon copier from the Trace Creek house. The second machine was seized by federal agents from Southern Truck Parts.
 
 
 23
 FBI and Secret Service fingerprint examiners concluded that prints recovered from parts of each machine were McCoy's. It was determined that the counterfeit currency distributed in Columbus was produced on a Canon Laser Color Copier.
 
 II.
 
 24
 Defendant McCoy contends that the court erred in the counterfeiting trial in permitting the government to introduce evidence of uncharged crimes against him. Over the defendant's objections, the court allowed the government to present evidence of McCoy's actions involving the counterfeiting of Canadian currency.
 
 
 25
 Under Federal Rule of Evidence 404(b)(2), similar acts evidence is admissible if the evidence is relevant to an issue other than character, necessary, reliable and the probative value outweighs the potential prejudice to the defendant. United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). Only if the admission of such similar acts evidence is "arbitrary or irrational" should the trial court be reversed. Id.; United States v. Masters, 622 F.2d 83, 85-86 (4th Cir.1980). The evidence of McCoy's foreign currency scheme was relevant under 404(b)(2) as it was inextricably bound up with the production of counterfeit U.S. currency. The evidence likewise proved intent, knowledge, plan, and motive. Potential prejudice to the defendant was minimized by the limiting instructions given by the court during the government's opening statement, testimony, and the judge's closing instructions.
 
 
 26
 Defendant McCoy argues that the court erred in refusing to permit McCoy to call Robert Nance to testify in the counterfeiting trial about prior inconsistent statements made by Copley. McCoy contends that the only direct evidence that McCoy was involved in a counterfeiting scheme came from the testimony of Copley, a convicted felon and perjurer. McCoy sought to call Robert Nance in his defense who was to testify that while Copley was in jail with Nance, Copley claimed he made counterfeit currency and that McCoy did not.
 
 
 27
 Federal Rule of Evidence 613(b) prohibits the introduction of extrinsic evidence of a prior inconsistent statement by a witness "unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Fed.R.Evid. 613(b). McCoy's counsel did not ask Copley on crossexamination whether he made the statement that McCoy was not involved in the production of U.S. currency. Copley did not have an opportunity to admit, deny, or explain his statement. Judge Staker did not abuse his discretion in ruling that the proffered Nance testimony was not admissible as extrinsic evidence to impeach by prior inconsistent statement because a proper foundation had not been laid under Rule 613(b). See United States v. Truslow, 530 F.2d 257, 264 (4th Cir.1975). Additionally, the statement was inadmissable hearsay evidence under Federal Rule of Evidence 804(b)(3) as there was no indicia of reliability to corroborate the evidence and there was no evidence that the Copley statement was, at the time it was made, against Copley's penal interest. See United States v. McDonald, 688 F.2d 224 (4th Cir.1982), cert. denied, 103 S.Ct. 726 (1983).
 
 
 28
 Defendant McCoy contends that the court erred in refusing to permit him to attend the hearing on the motion for new trial based on the evidence. In Barber v. United States, 142 F.2d 805, 806-07 (4th Cir.1944), this court held that a convicted defendant has no right to appear at a hearing on a motion for new trial. A Rule 33 hearing is not a trial and is not a critical stage in the prosecution. Thus, defendant's asserted fifth and sixth amendment claims to be present do not apply. McCoy cannot demonstrate any prejudice resulting from his absence at the hearing.
 
 
 29
 Defendant McCoy argues that the court erred in failing to grant a new trial based on Carl "Cateyes" Lockhart's testimony that he was a participant in the robbery and that defendants McCoy and Moore did not rob the Matewan bank. The credibility of the confession of another is a factual issue for resolution by the district court in a motion for new trial. Jones v. United States, 279 F.2d 433 (4th Cir.1960); see also United States v. Gantt, 298 F.2d 21 (4th Cir.1962). Judge Haden focused on the credibility of Lockhart. He determined that Lockhart had been coached and characterized the evidence as nonsense and obvious perjury. Based on the record, the court's rulings that the newly discovered evidence would not likely result in acquittal and denial of the motion for new trial were correct.
 
 
 30
 Defendant McCoy argues that the United States District Court for the Southern District of West Virginia lacked jurisdiction to try McCoy for the murder of Russell Davis because the killing took place in Meta, Kentucky. McCoy was charged and convicted, not or murder, but of violating 18 U.S.C. § 1512(a)(1)(C). This statute prohibits tampering with a witness, victim, or an informant. In 1988, 18 U.S.C. § 1512 was amended by adding a new subsection (h) to allow for venue where the proceeding was intended to be affected, as well as the district where the actions occurred. See 18 U.S.C. § 1512(h). The United States District Court for the Southern District of West Virginia had jurisdiction to try defendant McCoy for killing a potential federal witness in violation of 18 U.S.C. § 1512(a)(1)(C).
 
 
 31
 Defendant McCoy argues that the court erred in refusing to hold a James hearing to determine whether certain statements made by coconspirators should be admitted as evidence. While the Fifth Circuit has required pretrial hearings to determine the admissibility of a coconspirator's statement, see, e.g., United States v. James, 590 F.2d 575 (5th Cir.1979), this court has held that a district court need not conduct a pre-trial James hearing to determine admissibility. United States v. Hines, 717 F.2d 1481, 1488 (4th Cir.1983), cert. denied, 467 U.S. 1214 (1984).
 
 
 32
 McCoy contends that the prosecution of him was barred by the double jeopardy clause. Count Six of the indictment charges McCoy with conspiracy to intimidate Jimmy Tincher and John Robinson. Count 7 charges McCoy with the use of threats and intimidation against John Robinson. McCoy argues that these charges are identical to the charges in Indictment 3:89-00101 which charges McCoy and others of conspiring to kill and attempting to kill various persons, including Robinson and Tincher, in violation of 18 U.S.C. § 15(a)(1)(A) and 18 U.S.C. § 2.
 
 
 33
 Review of the indictments and trial records demonstrates that the offenses charged in the two indictments, although similar, were not identical. The prosecution of McCoy under both indictments was not barred by the double jeopardy clause because the offenses involved different schemes, plans, times, places, and individuals. See United States v. Ragins, 840 F.2d 1184, 1192-93 (4th Cir.1988).
 
 
 34
 Defendant Moore argues that the court erred in denying his timely motion for a severance. Moore was charged with conspiracy to rob a bank, bank robbery, and conspiracy to intimidate and intimidation of John Urps and Linda Curry. Moore contends that the charges brought against him were unrelated to the charges assessed against defendant McCoy for execution murder of a witness and intimidation of fellow members of a counterfeit ring with threats of death.
 
 
 35
 Defendants Moore and McCoy were properly joined in the indictment. It is settled law in this circuit that persons indicted as co-conspirators should generally be tried together. See, e.g., United States v. Spitler, 800 F.2d 1267, 1271 (4th Cir.1986). The charges against Moore and McCoy with respect to the bank robbery and conspiracy involved the same evidence and witnesses. The counterfeiting charges returned against McCoy were severed. The jury did not hear any evidence in the bank robbery trial about McCoy's counterfeiting operation. Moore and McCoy were also properly joined in the witness intimidation counts. Moore was not charged in three of these counts and the court gave cautionary instructions to the jury that they were not to consider evidence on those counts as against Moore. Because Moore cannot show any cognizable prejudice from the joinder resulting in a "miscarriage of justice," Spitler, 800 F.2d at 1271-72, the trial court did not abuse its discretion in denying Moore's motion for severance.
 
 
 36
 Defendants McCoy and Moore contend that the government failed to prove that their alleged intimidation of witness Linda Curry in Count 11 was related to a federal offense. Count 11 charged defendants McCoy and Moore with making threats to Linda Curry in violation of 18 U.S.C. § 1512(b). Title 18 U.S.C. § 1512(b) deals with intimidation to prevent communication of information "relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings." 18 U.S.C. § 1512(b).
 
 
 37
 In order to minimize prejudice to the defendants at trial, the parties and the court agreed that certain witnesses would only be asked if they knew of criminal activity by McCoy that violated federal laws without disclosing the nature of that criminal activity. Utilizing this procedure, the government did not use the word "federal" when examining Curry. Curry testified that she knew of "criminal activity" by McCoy and as a result was threatened by McCoy and Moore. Curry also testified that she had provided information to the West Virginia State Police and the FBI. Curry was subjected to cross-examination and re-direct examination based upon her testimony before a federal grand jury. Curry's testimony provided sufficient evidence from which the jury could fairly and rationally conclude that the threats made by McCoy and Moore were related to the commission of a federal offense.
 
 
 38
 Defendants McCoy and Moore next argue that the court erred in excluding the testimony of Imogene Cooper. Immediately following the robbery, investigators published in the Williamson Daily News a police artist's composite drawing of the truck thief of the stolen Ford Bronco. Imogene Cooper saw the composite in the newspaper and believed that the image looked like her former tenant, Charles Preece. Cooper did not see the truck stolen and was not a witness to the bank robbery. The defense did not offer any other evidence to suggest that Preece was involved in the Bronco theft or the bank robbery. The trial court correctly ruled that Imogene Cooper's testimony was not relevant and was likely to confuse the jury.
 
 
 39
 Defendant McCoy raises numerous other issues regarding admissibility of evidence, jury instructions, and sufficiency of the evidence. We find no merit to any of these assignments of error.
 
 
 40
 For the foregoing reasons, the convictions below are
 
 
 41
 AFFIRMED.